UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HEATHER PIKE, o/b/o E.D.P.,

                        Plaintiff,

        -against-                                    8:12-cv-0710 (LEK)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                        Defendant.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

        This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 18 ("Plaintiff's Brief"); 22 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

## II.   BACKGROUND

        On December 30, 2009, Plaintiff Heather Pike ("Plaintiff") filed an application for

Supplemental Security Income ("SSI") under the Social Security Act on behalf of her son, E.D.P.

("Claimant").  Dkt. No. 7 ("Record") at 9;[1] Pl.'s Br. at 1.  Plaintiff claimed a disability of speech

and language delays as well as Attention Deficit Hyperactive Disorder ("ADHD") and disruptive

behavior disorder.  R. at 12, 53.  The claim was initially denied on June 17, 2010, and on July 8,

2010, Plaintiff filed a timely request for a hearing.  R. at 9, 53.  Administrative Law Judge ("ALJ")

Carl E. Stephan ("Stephan") held a video hearing on May 19, 2011, in which Plaintiff and Claimant

_____

        [1] Citations to the Record are to the pagination assigned by the SSA.

appeared, R. at 9, and issued an unfavorable decision on July 21, 2011, R. at 22. Plaintiff appealed

the ALJ's decision on September 14, 2011, R. at 4-5, and the Appeals Council denied review, R. at

1. Plaintiff commenced the instant action on April 30, 2012. Dkt. No. 1 ("Complaint").[2]

**A. Claimant's Medical Records**

Claimant was born on May 13, 2004. R. at 266. Claimant resides with his parents, an older

half-brother, and a younger brother. R. at 332. Health maintenance reports from Plattsburgh

Primary Care and visit records for various physical ailments indicate that Claimant's initial growth

and development was normal. R. at 266-83, 288-302. However, Claimant's health maintenance

report prepared on August 31, 2007 noted "some behavioral concerns beginning." R. at 284-85.

The next report, prepared on September 2, 2008, stated that Claimant was "well behaved at school

but . . . violent at home," and that he would beat up his younger brother. R. at 286-87.

A visit summary to Plattsburgh Primary Care from November 16, 2006 discussed Claimant's

"prolonged temper tantrums." R. at 303.[3] The summary noted that Claimant's parents were "unable

to go anywhere because he is so rambunctious." R. at 304. Claimant's father stated that he had

similar symptoms as a child that eventually improved. Id. As a result, Claimant was diagnosed

with probable ADHD and prescribed Adderall. Id. A follow-up appointment on January 23, 2007

noted that the Adderall worked for a few days, but had exacerbated the problem since then. R. at

305. The Adderall was discontinued and Claimant was prescribed Ritalin instead. R. at 306.

---

[2] On October 1, 2013, Defendant moved to stay briefing in light of government
sequestration. Dkt. No. 20. This Motion was granted on October 2, 2013. Dkt. No. 21. Neither
party moved to lift the stay at any point, even though Defendant filed a Brief on October 30, 2013.
Dkt. No. 22. The Court sua sponte lifted the stay on June 11, 2015. Dkt. No. 24.

[3] While the same signature appears on each report from Plattsburgh Primary Care, the name
of the individual who signed the reports is not clear from the record.

2

Claimant returned on January 30 after he had an outburst in Walmart and had to be taken from the store kicking and screaming. R. at 307. At this time, preventive services were contacted for more intensive treatment. Id. Claimant was taken off Ritalin after this visit. R. at 308.

Claimant's behavior was evaluated during a subsequent visit on May 12, 2008, at which time he presented as "very oppositional defiant when he does not get his way," although his school behavior was reportedly improving. R. at 311. The report noted that Claimant frequently threw tantrums in public places. Id. The report recommended an evaluation by a child psychologist. Id.

On April 27, 2009, Claimant's school district assembled an Individualized Education Program ("IEP") for Claimant for the 2009-10 school year. R. at 155. Through a number of tests, Claimant was determined to have age-appropriate skills for basic concepts, sentence structures, and vocabulary, but had delays in recalling sentences and word structures as well as following directions. R. at 156-57. The IEP also identified various speech concerns and recommended a program of speech therapy. R. at 157-58. Claimant was determined to have "[n]o social needs that should be addressed through special education at this time." R. at 157.

On March 17, 2009, Dr. Anthony Ching evaluated Claimant at Plattsburgh Primary Care regarding his behavioral issues. R. at 401. Dr. Ching noted that Claimant presented no problems during the visit and that Plaintiff's only reported problems were at home. Id. In a follow-up visit on August 21, 2009, Claimant's father noted that his behavior was becoming increasingly dangerous to his younger brother. R. at 399. Dr. Ching stated that follow-ups would occur soon with Dr. Roger Patnode. R. at 400. In a September 15, 2009 visit, Dr. Patnode noted that Claimant presented symptoms of oppositional defiant disorder and that there were documented episodes of tantrums triggered by minor discipline. R. at 396. Dr. Patnode also mentioned that Claimant's father

3

described a history of depression in the family.  Id.  In an October 14, 2009 visit, Dr. Patnode

mentioned the continuation of Claimant's symptoms and prescribed Metadate CD.  R. at 393-94.

On a follow-up visit on November 5, 2009, Dr. Patnode noted the ineffectiveness of the Metadate

CD, which also caused sleep issues and a greater excess of energy.  R. at 391.  Dr. Patnode then

prescribed Adderall instead.  R. at 392.

Claimant underwent a psychological reevaluation pursuant to his IEP on November 13,

2009.  R. at 160.  The examiner, Meagan Webster, noted that Claimant was very quiet initially "but

warmed up significantly toward the end."  Id.  Claimant "became eager to talk and share stories with

the evaluator."  Id.  Claimant was scored as having an IQ in the average range, with his strongest

performance on the processing speed tests and his weakest on the verbal comprehension tests.  R. at

161-62.

Claimant's Adderall dosage was increased on a November 19, 2009 visit with Dr. Patnode

after seeing a marked improvement in Claimant's behavior.  R. at 389-90.  A December 8, 2009

follow-up discussed Claimant's continued sleep issues and lack of appetite.  R. at 387.  However,

since Claimant's issues persisted at home, Dr. Patnode prescribed an amphetamine to be taken in the

afternoon.  R. at 388.  Claimant's behavior was reported as improved, although still erratic, in a

January 9, 2010 visit with Dr. Patnode.  R. at 384.  As a result, Dr. Patnode also prescribed Strattera

to help alleviate behavioral problems in the evening and overnight.  R. at 385.

Claimant underwent a comprehensive assessment with Dr. John Schenkel on September 14

and 25, 2009 at the Clinton County Mental Health and Addiction Services.  R. at 331, 343.  Dr.

Schenkel, in his October 6, 2009 report, noted Claimant's tendency to hit his brothers and his

parents both at home and in public as well as his unwillingness to share toys, color pictures, or

follow directions.  R. at 331.  In specific instances, Claimant had punched his father in the face after running away from him in a store, thrown the family cat, and pulled down material from the ceiling of the car.  Id.  Claimant's parents reported that such behavior happened between two and seven times per day, primarily at home, and the symptoms started to noticeably appear roughly a year prior.  Id.  Claimant had on several occasions threatened to "shoot or kill his parents."  R. at 332.  Claimant's parents noted that they did not use spanking or physical punishments with him.  Id.  Dr. Schenkel stated that Claimant did get along with other children.  R. at 334.  He rated Claimant as having delayed expressive and receptive communication as well as self-care, as compared to average motor and cognitive development.  R. at 335.  At the time of the evaluation, Claimant was taking melatonin as a sleep aid.  R. at 336.  Dr. Schenkel observed that Claimant was easily irritated when his behavior was mentioned, but his behavior was generally pleasant, and that the reports of aggression primarily occurred at home.  R. at 339, 342.

In Dr. Schenkel's psychiatric evaluation dated February 2, 2010, Claimant's father also reported having a history of temper problems when he was a child, and that Claimant's grandfather had a short temper as well.  R. at 342.  Claimant's father had been taking Cymbalta to help with depression and anxiety.  R. at 341.  Given this history, Dr. Schenkel concluded that Claimant "appears to be suffering from some sort of genetic disorder [that] does not appear to be ADHD," pointing out that large doses of Adderall were ineffective at treating Claimant's symptoms.  R. at 341-42.  Dr. Schenkel noted that no DSM-IV disorder fit Claimant's symptoms and thus prescribed Guanfacine as a medication to inhibit rage.  R. at 342.

Claimant was reassessed pursuant to his IEP by Patricia Winterbottom ("Winterbottom"), a speech language pathologist at his school, on January 26-28, 2010.  R. at 376.  During the

5

evaluation, he had "difficulty following multi-step directions, recalling sentences, understanding sentence structures, listening to paragraphs and answering Wh- questions, and expressive vocabulary." Id. While Claimant was able to utilize several grammatical structures, he had difficulty recalling sentences. Id. Claimant was frequently distracted during the evaluation. Id. Winterbottom recommended that sessions continue five times weekly. R. at 377.

On February 1, 2010, Plaintiff prepared a function report for Claimant. R. at 126. The report found that Claimant was not able to communicate fully, noting that he did not ask many questions, talk about his activities, and could not answer questions about stories he had heard or deliver simple messages. R. at 129. Claimant was able to use complete sentences, talk with other children, and discuss things that had happened in the past. Id. While Claimant was able to identify colors, numbers, letters, and shapes, he was unable to define common words and did not know either his birthday or telephone number. R. at 130. Claimant did not share his toys or take turns, and was not affectionate toward his parents, but was able to engage in simple activities with other children. R. at 131. Claimant was able to dress himself, eat with a fork and spoon, and brush his teeth, but was unable to bathe without help and was generally unable to control his bowels and bladder during the day. R. at 132. Finally, Claimant's attention span was limited to roughly fifteen minutes. Id.

A questionnaire filled out by Plaintiff on March 17, 2010 discussed Claimant's aggression toward family members, his regular threats to hurt people or break things, and his aversion to sharing with his brother. R. at 137. Additionally, Claimant's IEP stated that Claimant did not know how to deal with frustrations and would need additional attention and support. R. at 138. Plaintiff noted that Claimant was taking Concerta and generic methylphenidate for these issues. R. at 137.

Claimant's kindergarten teacher, Mrs. DeBella, completed an evaluation on March 31, 2010. R. at 163. The teacher noted that Claimant had slight issues with acquiring and using information and typically would need directions simplified or repeated. R. at 164. He also had occasional issues with rushing through assignments and carrying out more complex instructions. R. at 165. The teacher stated that there were also some issues with Claimant's conversations, particularly in using adequate vocabulary and grammar and taking turns, and that even when the topic of conversation was known or when Claimant was prompted to repeat or rephrase his speech, it was difficult to understand more than two-thirds of his sentences. R. at 166-67. The teacher noted a few isolated incidents when Claimant was upset due to frustration and started to "cry to the point of hyperventalation [sic]," but stated that it had "happened only 2-3 times this year." R. at 168. Claimant was assessed as "never a behavior concern in the classroom" but was noted to have "processing and language [deficiencies] (expressive and receptive) that interfere with learning." R. at 170.

Claimant was evaluated on May 28, 2010 for his speech-language skills as part of the disability determinations process by North Country Kids. R. at 347. He received an overall score on the Clinical Evaluation of Language Fundamentals 4 ("CELF-4") of 72, which placed him in the third percentile. R. at 348. The evaluation indicated that Claimant had moderate receptive and expressive language disorders. R. at 348-49. Jillian Garrow, a speech language pathologist, recommended on June 1, 2010 that Claimant simply continue to receive services pursuant to his IEP. R. at 350.

Claimant's IEP for the 2010-11 school year was assembled on March 11, 2010. R. at 367. Based on Winterbottom's February evaluation, the IEP recommended more intensive support in

speech-language therapy to further develop his language skills. R. at 370. Claimant's work ethic was noted as strong, and he had improved in carefully completing assignments. R. at 369.

Claimant visited Dr. Schenkel on March 17, 2010 for medication management. R. at 419. Dr. Schenkel stated that Claimant was more under control during the day, and prescribed generic methylphenidate in addition to continuing Concerta to help with the evenings and overnight. Id. Claimant returned on May 19, 2010 for medication management. R. at 418. At that time, Dr. Schenkel reported that Claimant was doing well in school and was helpful and attentive. Id. Dr. Schenkel observed that prescribing Strattera had helped his brother and did the same for Claimant. Id.

On June 14, 2010, Dr. Bostic and Dr. Tatar, State Agency medical consultants, completed a Childhood Disability Evaluation Form based on the record, and concluded that while Claimant had a severe impairment, it did not meet, medically equal, or functionally equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. at 353. Dr. Bostic and Dr. Tatar found that Claimant had a less than marked impairment in acquiring and using information, attending and completing tasks, caring for himself, and interacting and relating with others. R. at 355-56. Claimant was found to have no impairment in the other domains. R. at 356.

On August 31, 2010, Claimant met with Dr. Schenkel for medication management. R. at 415. Dr. Schenkel noted that Plaintiff still had more problems in the afternoon, and continued his regimen of Concerta, generic methylphenidate, and Strattera. Id. Dr. Patnode noted on September 17, 2010 that Claimant was having a hard time sleeping, even with sleep aids, with the medication that he was taking, but did not alter his regimen. R. at 382. On December 17, 2010 and January 19, 2011, Claimant visited Plattsburgh Primary Care, and Dr. Patnode noted that Claimant's condition

8

had improved. R. at 378, 380. As a result, Dr. Patnode discontinued Claimant's methylphenidate prescription on January 19. R. at 379.

Claimant's language skills were evaluated by Winterbottom again on January 26, 2011. R. at 366. He scored higher on receptive than expressive language skills, but "demonstrate[d] a moderate expressive language delay." Id. Winterbottom noted that Claimant required additional processing time and asked occasionally for information to be repeated, but that he was a hard worker. Id. Winterbottom ultimately recommended that Claimant continue to receive extra speech and language support four times weekly. Id.

On February 16, 2011, Claimant met with Dr. Schenkel again for medication management. R. at 413. Dr. Schenkel reported that Claimant was at the top of his class, but that his morning medication would wear off by the afternoon and it would affect his ability to do homework. Id. Dr. Schenkel prescribed a larger dose of Ritalin. Id. Claimant returned to Dr. Schenkel on April 27, 2011. R. at 431. Plaintiff discussed Claimant's controlling nature at home, and that Concerta was initially effective in the morning but lost its efficacy in the afternoon. Id. During the visit, Claimant became very agitated and upset in the office. Id. Claimant was therefore prescribed Nefazodone. Id.

Dr. Patnode completed a Childhood Disability Evaluation Form on May 12, 2011 based on his observations. R. at 432. He determined that Claimant had a marked impairment in attending and completing tasks, interacting and relating with others, and caring for himself outside of school, and a less than marked impairment during school hours. R. at 433. Claimant also had a less than marked impairment in moving about and manipulating objects and acquiring and using information, and had no impairment in any other category. R. at 433-34. Dr. Patnode noted that Claimant had

9

sleep issues that had been improved on clonodine.  R. at 435.  Dr. Patnode relied on Dr. Schenkel's assessment to determine that Claimant had both ADHD and an anxiety disorder.  R. at 436.  Finally, Dr. Patnode reported moderate difficulties in Claimant's ability to maintain concentration, which were improved on medication.  R. at 437.

Dr. Schenkel also completed a Childhood Disability Evaluation Form on June 1, 2011.  R. at 439.  He noted an extreme impairment, outside of school, in attending and completing tasks and in caring for himself; a marked impairment in interacting and relating with others; a less than marked impairment in acquiring and using information, and no limitation in any other category.  R. at 440-41.  Dr. Schenkel characterized Claimant as likely having an anxiety disorder stemming from "an irrational fear of not being in control" and further clarified that he was "[u]nable to tolerate frustration."  R. at 443.  Dr. Schenkel also stated that Claimant had moderate difficulty in maintaining social functioning in school which became extreme at home, and that he had a marked difficulty in maintaining personal functioning and maintaining concentration, although this was improved for half of the day with medication.  R. at 444.  He further described the side effects of Claimant's medications as allowing for greater concentration and attention but exacerbating rage and anxiety, and mentioned that clinical trials had not yet been completed.  R. at 445.  Dr. Schenkel also expressed concern about Claimant's ability to participate in a professional, intimate, or social relationship, "all of which require an ability to tolerate frustration and relinquish control."  Id.  He noted that this was likely genetic and was not a DSM-IV-TR-recognized disorder that might or might not respond to medication.  Id.

Winterbottom and Claimant's first-grade teacher, Joan Howley, provided comprehensive reports dated May 16, 2011, and his special education teacher, Leslie LaValley, provided a similar

report dated May 17, 2011. R. at 208-31. All three rated Claimant as having serious problems with comprehending multi-step instructions, understanding vocabulary, comprehending written materials and word problems, as well as expressing ideas in written form and providing oral explanations and descriptions. R. at 209-10, 217-18, 225-26. Claimant also had some issues with participating in class discussions and applying problem-solving skills. R. at 209, 217, 225. Each report also noted that Claimant generally required additional processing time to understand questions and respond either orally or in writing. Id. Claimant had no regular issues in interacting with other children, although his ability to express thoughts and ideas in conversation was weak and he often did not ask for help in group activities. R. at 211, 213, 219, 221, 227, 229. Claimant's speech was rated to be generally intelligible. R. at 212, 220, 228. Claimant's medications as of May 3, 2011 included Concerta, generic methylphenidate, Nafazodone for anxiety and depression, and clonidine as a sleep aid. R. at 207.

Neighbors David Robare and Jessica Wood and family friend Sara Beaudet filled out similar questionnaires regarding Claimant's functioning on May 31, 2011. R. at 232-52. All three noted issues with Claimant's attention span and ability to follow instructions, noting that he had to be reminded to take turns. R. at 234, 241, 248. Claimant was also noted to have issues in interacting with both children and adults and expressing emotions productively. R. at 235, 237, 242, 244, 249, 251. Each questionnaire mentioned the fact that Claimant had to be constantly supervised and tended to lash out at both adults and other children verbally and physically, including his own parents. R. at 238, 245, 249, 252.

**B. ALJ Hearing**

Plaintiff, Claimant, and Plaintiff's husband and Claimant's father Dennis Pike ("Mr. Pike")

testified at a hearing before ALJ Stephan on May 19, 2011. R. at 27. Plaintiff testified that her husband was employed as a technician for coffee makers, requiring significant travel. R. at 32. Claimant's grades at school were average to below average. R. at 36-37. While Claimant did do his homework in the afternoon, it typically took an hour to do twenty to thirty minutes of work. R. at 34. Plaintiff reported that there were very few, if any, social issues at school and on the bus. R. at 34-35. While Claimant's friends would sometimes come over and play, Claimant would often have issues taking turns and would quickly become aggressive. R. at 35-36.

Claimant would throw tantrums roughly three to four times per day. R. at 37. These tantrums would be provoked by minor requests, such as asking him to clean his room or asking him to take turns. Id. Plaintiff recalled that earlier that morning, Claimant was told that they would be attending the hearing instead of him getting on the bus, and "for a good half-hour" he was crying and "flipping out." Id. Plaintiff mentioned another incident when Claimant punched his father after being told that they had to leave a friend's house. R. at 38-39. Claimant had also been aggressive with his younger brother "out of frustration," screaming at him over issues such as taking turns playing with toys. R. at 39. Plaintiff said that Claimant's behavior was dependent on the day and how well the medicine was working. R. at 41. This behavior was seen by neighbors, friends, and other relatives. R. at 40. Plaintiff stated that neither of her other two sons had similar behavior. R. at 38. Claimant would also often appear incapable of following directions. R. at 41. Plaintiff noted that when asked direct questions, Claimant would sometimes answer with "I don't know" or completely ignore the question. Id.

Plaintiff stated that Claimant had been diagnosed with both ADHD and anxiety issues. R. at 32. For these conditions, Claimant regularly saw his primary care physician, Dr. Patnode, and his

psychiatrist, Dr. Schenkel.  Id.  Plaintiff discussed the medications Claimant was taking, which

included Concerta and generic methylphenidate for the ADHD as well as Nefazodone for anxiety

and Clonodine as a sleep aid.  R. at 32-33.  She noted that the anxiety medication was new, and that

she had not seen much of a difference in terms of Claimant's anxiety.  R. at 33.  The Concerta was

effective during school hours, but it was wearing off in the afternoon, and the generic

methylphenidate, prescribed for afternoon behavior, was not effective.  R. at 33-34.  The medicine

also took roughly ninety minutes to take effect, so Plaintiff would have to wake Claimant early in

the morning to take the pill, and until the bus arrived, he would have significant excess energy.  R.

at 40.  Plaintiff noted that it generally took him twenty to thirty minutes to get dressed.  Id.  Dr.

Schenkel had previously stated that Claimant was "at his limit with the Concerta," and that the

remaining issues might be more attributable to anxiety.  R. at 41-42.

   Mr. Pike also testified to Claimant's behavioral issues.  R. at 42.  He described the typical

tantrum as Claimant first clenching his fist, then getting upset, with the veins on his neck standing

out and his face getting red.  R. at 43.  Claimant would then start hitting things until told to stop and

control his hands, at which point he would stomp away from the adult and break something, such as

a toy against a wall.  Id.  On the one day that Claimant had not had his medication, he was

impossible to control without someone physically restraining him on the couch.  R. at 44-45.  Mr.

Pike felt like it was his responsibility to minimize Plaintiff's involvement because Claimant would

hit people that were trying to calm him down.  R. at 43.  He noted that Claimant had hit both him

and Plaintiff in the past.  R. at 46-47.  Mr. Pike mentioned that whenever Claimant was in public, he

would refuse to listen to simple instructions, and would often run away, including through parking

lots.  R. at 44.

Claimant testified that his birthday was May 13.  R. at 48.  Claimant expressed that he enjoyed school and each of the subjects that he was asked about.  R. at 49-50.  He stated that he had friends that he would play with at recess, and that he played with his friends after school as well.  R. at 50.  When asked about his relationship with his brothers, he confirmed that he got along with them.  Id.  He also said that he wanted to be a teacher when he grew up.  R. at 50-51.  He admitted that he sometimes had trouble with his homework, and that his mother would help him.  R. at 51.  He noted that he liked soccer and baseball and played them at home.  Id.

### C.  Procedural History

ALJ Stephan issued an unfavorable decision on July 21, 2011.  R. at 6.  While ALJ Stephan found that Claimant had not engaged in substantial gainful activity and that he had severe speech and language delay, ADHD, and disruptive behavior disorder, this combination of impairments did not meet or medically equal the Listings.  R. at 12.  Specifically, ALJ Stephan found that Claimant had: (1) a less than marked limitation in acquiring and using information; (2) a less than marked limitation in attending and completing tasks; (3) a less than marked limitation in interacting and relating with others; (4) no limitation in moving about and manipulating objects; (5) a less than marked limitation in ability to care for himself; and (6) no limitation in health and physical well-being.  R. at 15-22.  Accordingly, ALJ Stephan concluded that Claimant was not disabled under the Social Security Act since December 30, 2009, the date the application was filed.  R. at 22.

## III.  LEGAL STANDARD

### A.  Standard of Review

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the decision is supported by substantial evidence in the Record.  42

U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).  Substantial evidence amounts to "more than

a mere scintilla," and it must reasonably support the decision maker's conclusion.  Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The Court defers to the Commissioner's decision if it is supported by substantial evidence, "'even if

it might justifiably have reached a different result upon a *de novo* review.'"  Sixberry v. Colvin, No.

12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of

Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the Court should not

uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the

ALJ applied the correct legal standards.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### B.  Standard for Benefits

To qualify for SSI benefits, an individual must demonstrate that he or she is "disabled" as

defined under the Act.  "An individual under the age of 18 shall be considered disabled . . . if that

individual has a medically determinable physical or mental impairment, which results in marked and

severe functional limitations, and which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 1382c(a)(3)(C)(i).

The SSA has established a three-step process for determining whether an individual under

the age of eighteen is eligible for SSI benefits on the basis of a disability.  20 C.F.R. § 416.924(a).

First, the ALJ considers whether the child is engaged in "substantial gainful activity."  Id.

§ 416.924(b).  Second, the ALJ determines whether the child has a "medically determinable

impairment that is severe," which is defined as an impairment that causes "more than minimal

functional limitations." Id. § 416.924(c).  Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment meets, medically equals, or functionally equals a disability in the Listings.  Id. § 416.924(d).  If an impairment is found to meet or qualify as the medical or functional equivalent to a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled.  Id. § 416.924(d)(1).

A child's functional limitations are evaluated in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  Id. § 416.926a(b)(1).  Severe impairments, or combinations thereof, will be found to functionally equal the Listings if they result in an extreme limitation in one domain or a marked limitation in two domains.  Id. § 416.926a(a).

## IV.    DISCUSSION

Plaintiff argues that the Commissioner's final decision was not based on substantial evidence because the ALJ did not afford sufficient weight to: (1) Claimant's documented threats and aggressive behavior; (2) the questionnaires completed by three of Claimant's neighbors; (3) Dr. Schenkel's observations of Claimant's anger; (4) Dr. Schenkel's report stating, among other things, that Claimant's limitations in caring for himself and attending and completing tasks was extreme; and (5) Dr. Schenkel's observation that Claimant's behavior at home compared to at school was "characteristic of an anxiety disorder" and thus not inconsistent.  Pl.'s Br. at 3-5.[4]  The Court shall consider these objections with their correspondence to the Listings in the areas of: (1) attending and

---

[4] Plaintiff does not argue specific points of law in her Brief.  Pl.'s Br.  However, based on the facts Plaintiff has chosen to emphasize, the Court will construe these facts as the basis for Plaintiff's disagreement with ALJ Stephan's decision.  Id. at 3-5.

completing tasks, (2) caring for himself, and (3) interacting and relating to others.[5]

**A. Attending and Completing Tasks**

This domain considers how well the child is able to focus and maintain their attention, and how well they begin, carry through, and finish their activities. 20 C.F.R. § 416.926a(h). As a school-age child,

> You should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes on your work . . . . You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores.

Id. § 416.926a(h)(2)(iv).

Plaintiff relies on Dr. Schenkel's finding that Claimant has an "extreme" limitation in attending and completing tasks. Pl.'s Br. at 5. Plaintiff testified that Claimant has great difficulty at home with completing homework and getting ready for school. R. at 34-40. She also mentioned that in an IEP evaluation, Claimant's teacher stated that he needed extra attention and support in completing tasks. R. at 138. Dr. Schenkel, in his comprehensive assessment from October 6, 2009, stated that Claimant "can't sit and color a picture," and stated in his psychiatric evaluation from February 2, 2010 that Claimant "does not persist long at games or a number of activities." R. at

---

[5] In her Brief, Plaintiff does not specifically plead facts inconsistent with ALJ Stephan's findings that Claimant's ADHD does not meet or medically equal the criteria of listing 112.11 and that Claimant's disruptive behavior disorder does not meet or medically equal the criteria of listing 112.08 or 112.11. See R. at 12; see also 20 C.F.R. Part 404, Subpart P, App. 1, Sections 112.08, .11. Although Plaintiff notes that Dr. Schenkel did diagnose Claimant with both of these conditions, Pl.'s Br. at 2, the remainder of Plaintiff's Brief focuses on Claimant's aggressive and disruptive behavior, which is not relevant to the analysis under either Section 112.08 or 112.11. See 20 C.F.R. Part 404, Subpart P, App. 1, Sections 112.08, .11.

331, 341.

ALJ Stephan found that Claimant has a less than marked limitation in this domain in part because Claimant's 2010-11 IEP indicated a strong work ethic that teachers were using as a model for other students. R. at 17. In fact, Plaintiff's assertion that Claimant's teachers determined that he needed extra help is not generally supported by Claimant's IEPs or school evaluations, which are mostly positive. The State agency consultants also found a less than marked limitation in this domain. R. at 355. Claimant's teachers at school stated that he had few significant problems in this domain, with the exception of carrying out multi-step instructions. R. at 165, 210, 218, 226. Finally, the three neighbors and friends who filled out reports noted either slight or obvious problems, but none of them reported that Claimant had serious problems with any of the activities contemplated in this domain. R. at 234, 241, 248. Plaintiff's recitation of contrary facts does not include any information inconsistent with finding a less than marked limitation in this domain, and instead mostly focuses on Claimant's aggressive behavior, which is not relevant to the standard outlined above. Therefore, the Court finds that the ALJ properly found that Claimant has a less than marked limitation in the domain of attending and completing tasks.

### B. Caring for Yourself

This domain considers "how well [the child] maintain[s] a healthy emotional and physical state, including how well [they] get [their] physical and emotional wants and needs met in appropriate ways; how [they] cope with stress and changes in [their] environment; and whether [they] take care of [their] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). As a school-age child,

You should be independent in most day-to-day activities (e.g., dressing

18

yourself, bath yourself), although you may still need to be reminded
sometimes to do these routinely. You should begin to recognize that
you are competent in doing some activities and that you have difficulty
with others. You should be able to identify those circumstances when
you feel good about yourself and when you feel bad. You should begin
to develop understanding of what is right and wrong, and what is
acceptable and unacceptable behavior. You should begin to
demonstrate consistent control over your behavior, and you should be
able to avoid behaviors that are unsafe or otherwise not good for you.
You should begin to imitate more the behavior of adults you know.

Id. § 416.926a(k)(2)(iv).

Plaintiff relies on Dr. Schenkel's finding that Claimant has an "extreme" limitation on caring

for himself. Pl.'s Br. at 5. Plaintiff also distinguishes between reports of Claimant's behavior at

school and at home. Id. at 3, 5.

ALJ Stephan noted Plaintiff's early reports of Claimant being unable to wash or bathe

without help, to control his bowels overnight, or to put his toys away. R. at 21. Dr. Schenkel also

reported that Claimant, during his tantrums, would lose control of himself. R. at 331. However,

Mr. Pike testified at the ALJ hearing that Claimant's tantrums typically involved targeted aggression

and stomping away. R. at 43. Neighbors and friends reported that Claimant had a serious problem

with handling frustration appropriately, but not with any other activity within this domain. R. at

236, 243, 250. At school, though, Claimant was determined by his teachers to have only isolated

problems, either with asking for help or being occasionally overwhelmed with a task. ALJ Stephan

noted that an extreme limitation would be consistent with a complete inability to function in this

domain and would be unsupported by the record. R. at 21. As a result of Claimant's improvement

with medication, ALJ Stephan determined that Claimant's limitation in the ability to care for

himself was less than marked. Id.

Plaintiff's argument focuses on the severity of Claimant's aggressive behavior at home. However, ALJ Stephan noted that the medication Claimant is taking has been improving his symptoms. R. at 21. Indeed, the record makes a number of mentions of improvement of Claimant's behavior reported by Claimant's parents as well as both Dr. Patnode and Dr. Schenkel. R. at 380, 384, 390, 413. While Plaintiff identifies information that might lead to the conclusion that Plaintiff's limitation is marked, it does not identify a flaw with ALJ Stephan's reasoning, as he gave great weight to Plaintiff's friends and neighbors and did not reject Plaintiff's theory that Claimant's behavior was different at home than at school. R. at 14, 21. Therefore, the Court finds that the ALJ properly found that Claimant has a less than marked limitation in the domain of caring for himself.

### C. Interacting and Relating with Others

This domain considers how well the child initiates and sustains emotional connections with others, develops and uses language, cooperates with others, complies with rules, responds to criticism, and respects others' possessions. 20 C.F.R. § 416.926a(i). As a school-age child,

> You should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

Id. § 416.926a(i)(2)(iv).

Plaintiff relies not only on Dr. Schenkel and Dr. Patnode's opinions that Claimant has a "marked" limitation in interacting and relating with others, but also on reports from neighbors and friends that discuss Claimant's behavior. Pl.'s Br. at 3-5. Plaintiff also relies heavily on Dr. Schenkel's comprehensive assessment, which includes references to Claimant's threats to kill his

parents, being violent towards the family cat, and damaging property.  Id. at 3.  Plaintiff notes that

Claimant's good behavior at school is not inconsistent with his reported behavior at home, implying

that more weight should be given to Dr. Schenkel and Dr. Patnode's determinations of Claimant's

limitations.  Id. at 5.

ALJ Stephan relied significantly on school evaluations in determining that Claimant has less

than marked limitation in interacting and relating with others.  R. at 18-19.  He discussed the reports

submitted by Claimant's teachers, which all stated that outside of Claimant's use of vocabulary and

grammar, he had only slight problems in this domain.  R. at 211, 219, 227.  While not mentioned,

this is generally consistent with the report completed by Claimant's kindergarten teacher, in which

Claimant was determined to have an obvious problem with language appropriate to the situation and

listener and only slight problems otherwise, including using adequate vocabulary.  R. at 166.

Claimant's IEPs for both the 2009-10 and 2010-11 year indicate that he has very little demonstrated

trouble in this area.  R. at 155-59, 367-72.

Plaintiff's Brief relies heavily on Claimant's conduct at home, for which the available

sources are Plaintiff and her husband, Dr. Schenkel and Dr. Patnode, by history, and the three family

friends.  Pl.'s Br. at 3-5.  In fact, ALJ Stephan gave the three family friends' opinions "great weight

as they are supported by evidence."  Those friends' opinions, which note that Claimant has serious

issues with appropriate expression of anger but lesser problems in other areas, are the basis for ALJ

Stephan's disagreement with Dr. Schenkel and Dr. Patnode.  R. at 18-19.  Furthermore, the ALJ

relies on Plaintiff's testimony that Claimant is able to make friends and keep them outside of school.

R. at 19.

In sum, Plaintiff points to contrary evidence to the ALJ's conclusion without identifying any

error in his reasoning; however, the question for the Court is whether there is substantial evidence supporting the ALJ's conclusion, not whether substantial evidence would support a different conclusion.  See <u>Bonet</u>, 523 F. App'x at 59.  The ALJ therefore properly found that Claimant has a less than marked limitation in interacting and relating with others.

In conclusion, ALJ Stephan was correct in his determination of Plaintiff's limitations because he reasonably evaluated all of the relevant evidence and his determination is adequately explained and supported by substantial evidence in the record.  20 C.F.R. § 416.924(a)-(d), (g).

V.       **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED**.

DATED:        February 09, 2016
                      Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge